Robert W. Sadowski
SADOWSKI KATZ LLP
800 Third Ave, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341

*Attorneys for Dr. Dan Giurca*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. DAN GIURCA,<br><br>         Plaintiff,<br><br>   - against -<br><br>ORANGE REGIONAL MEDICAL CENTER, GARNET HEALTH, formerly known as, GREATER HUDSON VALLEY HEALTH SYSTEM, JERRY DUNLAVEY, MBA, DRS. ULRICK VIEUX, and RICHARD WANG,<br><br>         Defendants. | Civ. No.:<br><br>**<u>COMPLAINT</u>** |

Dr. Dan Giurca ("Dr. Giurca") by and through his attorneys, Sadowski Katz LLP, alleges for his complaint as follows:

**PRELIMINARY STATEMENT AND NATURE OF THE ACTION**

1. This is a civil action brought by Dr. Giurca against the Defendants Orange Regional Medical Center ("ORMC"), Garnet Health, formerly known as Greater Hudson Valley Health System ("GH"), Jerry Dunlavey ("Dunlavey"), and Drs. Ulrick Vieux ("Vieux"), and Richard Wang ("Wang") (collectively "Defendants") under the retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3729(h), the New York State False Claims Act N.Y. Fin. L.§ 191, N.Y. Labor Law § 741, and defamation, tortious interference with contract/prospective business relations, breach of contract, defamation and conversion claims to recover damages

sustained by Dr. Giurca.  Defendants retaliated against Dr. Giurca for his bringing to light and attempting to correct Defendants' violations of the Federal and State False Claims Acts, which resulted in patient harm and abuse and defrauded the Medicaid and Medicare Programs.  Plaintiff witnessed and reported to Defendants the neglect of patients and malpractice.

2. This action also seeks to recover damages suffered by Dr. Giurca caused by Defendants' unlawful retaliation in violation of 31 U.S.C. § 3730(h) and N.Y. Fin. Law 191, and N.Y. Labor Law § 741, and injunctive relief to cause Defendants to cease and desist disparaging Dr. Giurca and to return his property which Defendants have refused to do, thus continuing to harm Plaintiff's career.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), and supplemental jurisdiction over the remaining claims.

4. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the Southern District of New York and Defendants reside in New York, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

5. Plaintiff is Dr. Giurca, who at the time of his departure from ORMC was Board certified in Psychiatry and Neurology and held the position Consultation Liaison Psychiatry Director at ORMC.

6. Defendant Orange Regional Medical Center is the hospital/medical center serving Orange County and the surrounding area.

7. Defendant Greater Hudson Valley Health System ("GH") is a health care provider in the greater Hudson Valley.

8. Defendant Jerry Dunlavey, MBA is the Vice President/Executive Director of GH.

9. Defendant Dr. Ulrick Vieux is the Chief of Psychiatry and residency program director at ORMC.

10. Defendant Dr. Richard Wang defamed Dr. Giurca in a form submitted to health care providers and caused Dr. Giurca to be denied privileges at other health care facilities.

## THE LAW

**A.    The Federal False Claims Act Relief from Retaliatory Actions.**

11. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

12. Relief shall include reinstatement with the same seniority status that employee, contractor, or agency would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

31 U.S.C. § 3730(h).

**B. The New York State False Claims Act Protection from Retaliation**

13. Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or

penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of this article, shall be entitled to all relief necessary to make the employee, contractor or agent whole.  Such relief shall include but not be limited to:

    (a) An injunction to restrain continued discrimination;
    (b) Hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position;
    (c) Reinstatement of full fringe benefits and seniority rights;
    (d) Payment of two times back pay, plus interest; and
    (e) Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

### C. New York Labor Law § 741

14.    New York Labor Law provides that "no employer ['who provides health care services in a facility'] shall take retaliatory action against any employee who does any of the following:"

    (a) Discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or
    (b) Objects to or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

### FACTS

15.    Dr. Giurca raised many concerns at ORMC, which rise to the level of violations of the Federal and New York State False Claims Acts.

16.    On or about January 6, 2017, Dr. Giurca commenced employment with GH at ORMC by entering an employment Contract.

17. Contrary to the terms of Dr. Giurca's employment agreement he was forced to do the work of at least two doctors: managing patients on the psychiatric unit, being the psychiatrist in charge of consultation-liaison, plus supervising residents, as well as teaching resident classes.

18. Dr. Giurca brought this contract breach to the attention of Dunlavey on or about March 22, 2017, who had previously told Dr. Giurca in writing that "We do not expect you to do two jobs or the work of two people." The Department of Psychiatry Chair Dr. Rojas responded on March 29, 2017, saying that "we want to keep you healthy and happy working here at ORMC," and that the medical group will meet and come up with an agreement.

19. On April 28, 2017 and on May 5, 2017, Dr. Giurca was again imposed upon to take up work for which he had not agreed in his contract and for which he was not paid additional compensation and called this breach to the attention of Dr. Rojas of GH.

20. Throughout this time, Dr. Giurca alerted Defendants to the fact that he suffered from hypertension for which he takes medication and that doing two jobs has adversely affected his blood pressure. In fact, Defendants were alerted to Dr. Giurca's hypertension at the time he was hired and given the assurances that "We do not expect you to do two jobs or the work of two people" to accommodate Dr. Giurca's hypertension.

**Reporting Medical Mistreatment**

21. Dr. Giurca brought to the attention of Dr. Rojas instances when patients were left over from another doctor, often Dr. Al Tariq, for Dr. Giurca to handle with insufficient notations of why the patient was not treated, *e.g.*, alcohol blood level of patient 529983 who was in the emergency room on May 17, 2017 with a bare notation of "Schizoaffective Dis[order] Reevaluate at am." This bare note is insufficient and inappropriate medical documentation for

the next team, which did not know the details of the evaluation or plan of action for this patient. Also, for billing purposes, this notation lacked the elements for up-coding.

22. Dr. Al Tariq allowed patient 529983 to sign out, when the patient needed to be admitted to the psychiatric unit according to the consultation liaison team. Patient 529983 returned to the emergency room the next day May 18, 2017.

23. On or about June 16, 2017, Dr. Giurca reported to Dr. Rojas that a patient suffering from Post Traumatic Stress Disorder ("PTSD") was seen in the emergency room by Dr. Al Tariq, who told the patient to "snap out of it", and a family member later complained about the comment. As Dr. Giurca reported, evidence based medicine provides that people cannot just "snap out" of PTSD.

24. On March 17, 2018, Dr. Giurca filed a complaint with the New York State Office of Mental Health ("NYS OMH") regarding Dr. Quazi Al-Tariq regarding his pattern of compromising safety of psychiatry patients at ORMC. Specifically, Dr. Giurca reported that Dr. Al-Tariq failed to respond for several hours (for patients 1002603 and 76595 the delay was 7 hours) when he is on-call in the emergency room; that Dr Al-Tariq told a patient with PTSD to "snap out of it;" that he told a patient who did not have money for medications "but you have money for food;" that he discharged a patient from the medical floor who attempted suicide, who was scheduled for involuntary psychiatric admission, who then immediately made a second unsuccessful suicide attempt; and that he compromises patient safety by failing to timely write patient notes—sometimes for several hours.

25. On May 16, 2018, Dr. Giurca again complaint to NYS OMH about Dr. Al-Tariq, who routinely arrives 2 hours late for his shift. Although all psychiatrists are to be onsite during calls, Dr. Al-Tariq is offsite sleeping at home and refusing to answer the telephone for hours

6

compromising patient safety. Further Dr. Giurca noted to NYS OMH that the head of the psychiatry unit and hospital management at ORMC had tolerated Dr. Al-Tariq's abuses despite multiple complaints.

26.     On June 8, Dr. Giurca made his third complaint to NYS OMH about Dr. Al-Tariq. Dr. Giurca reported that on or about June 8, 2018, Dr. Al-Tariq discharged an adolescent girl from the emergency room at ORMC who reported that she wanted to kill herself by taking pills. Dr. Al-Tariq told the girl that even if she takes all her pills, it would not kill her. Dr. Al-Tariq's statement had the effect of encouraging the patient to search out for more lethal methods of suicide and giving her the freedom to kill herself. As Dr. Giurca reported, discharging a child with suicidal thoughts and a plan is very dangerous. Dr. Giurca also reported that Dr. Al-Tariq is not present in the hospital during his shift and does not respond to calls.

27.     In August and September 2018, Dr. Giurca repeatedly complained that in violation of his contract he was indeed expected to do "2 jobs or the work of 2 people." The assignment of additional work not only violated the scope of his contract, but also Dr. Giurca repeatedly reminded ORMC and GH that his existing health condition of hypertension prevented him from overwork.

28.     On September 26, 2018, Dr. Rojas told Dr. Giurca that he had seen Dr. Giurca's photograph on the wall of the Montefiore Wakefield hospital security office with other individuals photographs who were deemed a "security risk." Dr. Giurca has never worked at Montefiore Wakefield—only Montefiore Mount Vernon and Rochelle. Dr. Rojas then asked Dr. Giurca what he had done to be exposed on a blacklist. Dr. Rojas told others at ORMC that he had seen Dr. Giurca's photograph at Montefiore Wakefield.

**Dr. Giurca's Contributions to ORMC**

29. In August 2017, Dr. Giurca proposed to Drs. Rojas and Vieux an idea for an article on controlling prescriptions of psycho-pharmaceuticals to reduce the risk of suicide by overdose.

30. In November 2017, Dr. Giurca received interest from the journal *Current Psychiatry* regarding publishing the article in the "Pearls" section.

31. On February 1, 2018, Dr. Giurca's article *Decreasing Suicide Risk with Math* was published in *Current Psychiatry*, which was the first psychiatry publication from ORMC.

32. As follow up to this article, Dr. Giurca inquired of the FDA if it knew the lethal dose of lithium for humans to which it responded that the FDA did not have that information. On April 26, 2018, Dr. Rojas responded to Dr. Giurca that there is "no question about how helpful your article is."

33. From January 2017 through February 2108, Dr. Giurca was praised by Drs. Vieux and Rojas for his work as the Director of Consultation-Liaison Psychiatry at ORMC.

34. Dr. Giurca devised a template for patient interviews and a template for writing notes, which enabled residents rotating through CL psychiatry to pass the clinical skills verification exam.  Dr. Giurca wrote an article about his method of supervising residents entitled *Engineering better doctors*, which in March 2018 was under peer review.  Dr. Giurca's method of teaching and supervision decreased new psychiatric patient evaluation time from 120-180 minutes to 30-60 minutes as measured by hard quantifiable data.  In fact, nurses complimented the psychiatry notes made under Dr. Giurca's supervision.

35. Since Dr. Giurca started in January 2017, Consultation-Liaison was the only psychiatry section that had stability and according to quarterly productivity reports Dr. Giurca has consistently been rated number 1 in the psychiatry rankings—the highest rating.

36. Dr. Giurca's second article since arriving at ORMC entitled "Data-driven prescribing" was published online on October 1, 2018.

37. On September 28, 2018, Dr. Giurca was working on a third article involving time series analysis of poison control data. Epic IT offered to spend $100,000 or more to buy poison control data for Dr. Giurca's research.

38. At this time Dr. Giurca, to advance his research, was studying advanced mathematical methods at the Massachusetts Institute of Technology ("MIT").

39. Dr. Giurca obtained the relative value units ("RVU") for every doctor at ORMC, which is a relative comparison of how much money each doctor made for the hospital. Dr. Giurca was at 41%, Dr. Vieux was at 14%, and Chief Executive Officer Dr. Galarneau and Medical Director of GH Dr. Nowosielski who were present when Dr. Vieux defamed Dr. Giurca were both under 10%.

**Retaliatory Actions**

40. After Dr. Giurca expressed his concerns, ORMC and GH, aided and abetted by the individual Defendants commenced an organized and coordinated, and ever escalating campaign of retaliatory actions as a direct result of his whistleblowing.

41. On September 26, 2018, the same day he was informed that his photograph was on the Montefiore blacklist, Dr. Rojas told Dr. Giurca that Rojas was transferring to Catskill and as a result Dr. Giurca would have to cover the behavioral health unit red team (covering 10 patients) in addition to his main position as Consultation-Liaison Director full-time Monday

9

through Friday from 8:30 am to 4:30 pm.—effectively doing two jobs for an indefinite period of time in violation of his contract agreement. Dr. Giurca warned Mr. Dunlavey that he was concerned overwork would negatively impact on his existing health condition.

42. On October 2, 2018, Dr. Vieux falsely accused Dr. Giurca of using the residents for the bulk of the work on Dr. Giurca's first article, and further accused Dr. Giurca of not choosing journal club articles properly, and further, with hostility and false statements, accused Dr. Giurca of not doing Consultation Liaison properly. Since February 1, 2018, Dr. Vieux had been systematically defaming Dr. Giurca to key decision makers in the hospital such as Dr. Israelski, director of graduate medical education.

43. On October 2, 2018, Dr. Vieux falsely accused Dr. Giurca of using residents to perform the bulk of the work for his article and who were allegedly furious with Dr. Giurca. In an audio recording Dr Giurca asked the chief resident if the residents were angry with him for any reason. The chief resident denied it and stated that he liked the Consultation-Liaison rotation under Dr. Giurca and was pursuing Consultation-Liaison as a fellowship/career choice because of the positive experience with Dr. Giurca.

44. On October 3, 2018, Dr. Gerard Galarneau Chief Executive Officer of GHVMG dismissed the complaint Dr. Giurca made against Dr. Vieux for disruptive behavior and making false accusations against him.

45. On October 3, 2018, resident Dr. James Crawford flatly denied having anything to do with any part of Dr. Giurca's first article, as Dr. Vieux had falsely accused Dr. Giurca.

46. Resident Dr. Crawford also supported Dr. Giurca's teaching methods and residents Dr. Jarmon and Dr. Miranda expressed pleasure with their Consultation Liaison

rotation and learning experience with Dr. Giurca, so much so that they both expressed interest in pursuing a Consultation Liaison fellowship.

47. On October 4, 2018, Mr. Dunlavey fired Dr. Giurca without cause. Dr. Giurca asked Dr. Rojas if he knew why, and if he would help with an appeal.

48. On the very day that Dr. Giurca was praised for his second article and it was circulated to the ORMC staff, Dr. Giurca was fired without cause.

49. Dr. Giurca has been denied access to and the return of the computer files data used in his research and reported in his articles. ORMC has blocked his Yahoo email addresses, shut off his hospital email, and commanded Dr. Giurca to NOT contact any ORMC or GH employee or resident and incredibly, put the hospital on lock down after Dr Vieux reportedly asked security to escort him to his car, to further defame Dr Giurca.

50. When Mr. Dunlavey, Chief of GHV and Mr. James Cuomo HR Chief called Dr. Giurca to terminate him without cause, Dunlavey claimed that they will not say anything bad to harm or prevent future employment. In an audio recording, Dr. Giurca asked that they not do anything to prevent him from obtaining another job. Dunlavey stated "absolutely not, we wish you nothing but the best."

51. On October 5, 2018, Dunlavey wrote to Dr. Giurca the following: "Anyone who calls us is only given a confirmation of your dates of employment, no other information is shared related to the reason for your departure." However, when Dr. Giurca sought to obtain privileges at a major hospital center after he won the bid process, the hospital refused to credential Dr. Giurca because ORMC doctor Richard Wang reported on an administrative form that Dr. Giurca was terminated without specifying the reason. This would have been an indefinite and lucrative contract worth at least $8000/week.

52. Defendants terminated Dr. Giurca in retaliation for his whistleblowing activity. Additionally, Defendants defamed him and have taken active steps to prevent Dr. Giurca from practicing psychiatry and pursuing his research.

53. Defendants intentionally retaliated against Dr. Giurca because he raised serious violations of law by Defendants and disclosed their fraud and because Defendants feared he was a whistleblower in an action filed against them.

54. As a result of Defendants' actions, Dr. Giurca has suffered economic damages, including but not limited to the loss of his job, expenses related to buying a new home to live closer to ORMC where the density of jobs is decreased, expenses in seeking new work, lost wages, lost vacation time, research data, and damages resulting from personal hardship, such as emotional distress, reputational damage caused by Defendants' defamatory statements to his potential employers, and other attempts by Defendants to harm his professional standing and career.

**Summary**

55. Dr. Giurca exposed a culture of compromising patient safety at ORMC.  Indeed, Dr. Giurca contacted New York State Office of Mental Health three times in 2018.  He reported to senior management his concerns for patient safety, but the Psychiatry Chair and hospital leadership turned a blind eye.  When it became obvious that Dr. Giurca was a whistleblower and had information for which he could file a False Claims Act action against ORMC and certain doctors, ORMC retaliated.  When the leaders of ORMC deviated from their contractual obligations, and asked Dr. Giurca to perform two jobs as both Consultation Liaison Director and inpatient unit, two positions which are designed to be held by two individual doctors—he again expressed patient safety concerns and that his health did not permit the stress of two jobs.  After

he complained about doctors not showing up and doing potential harm to patients, the newly appointed Chair Dr. Vieux defamed Dr. Giurca and tried to steal Dr. Giurca's first published article, in order to give credit to residents for work they did not do, and to ultimately garner credit for himself for meeting the ACGME requirement that residents publish articles, because the residency program is new and under special observation by ACGME.  Defendants deliberately acted to harm Dr. Giurca for raising legitimate concerns that rise to the level of fraud, and Defendants are now interfering with his ability to work elsewhere.

## FIRST CLAIM
## Violations of the Federal False Claims Act
## (31 U.S.C. § 3730(h))
## Retaliation

56. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

57. Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

58. Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him without valid reason, by defaming him, by harming his professional and career advancement and potential employment opportunities for which he was a successful bidder.

59. Such conduct by Defendants was due to actions Plaintiff has taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

60. Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## SECOND CLAIM
### Violations of the State False Claims Act
### (N.Y. Fin. Law § 191)

61. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

62. Defendants violated Section 191 of the New York False Claims Act § 191.

63. Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him without a valid reason, by defaming him, by harming his past present and future business and professional and career development.

64. Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of his efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

65. Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## THIRD CLAIM
### New York Labor Law § 741

66. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

67. Defendants violated New York Labor Law § 741.

68. Defendants have intentionally retaliated against Plaintiff by marginalizing him and terminating him without valid reason, by defaming him, by harming his past present and future business and professional and academic and career development.

69. Such conduct by Defendants was due to Plaintiff's actions as a health care worker in a health care facility taken in furtherance of his efforts to stop patient harm, fraud and abuse,

or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

70. Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## FOURTH CLAIM

### Injunctive Relief

71. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

72. Defendants intended and did inflict harm to Plaintiff, which resulted in special damages, including but not limited to the loss of employment, business contracts and business opportunities and by wrongfully withholding valuable research data that belongs to him, which Defendants appear to be converting to their own use for their own advancement.  Plaintiff has also accrued 113.23 hours of paid time off, at $125.00 per hour, Dr. Giurca is due $14,153.75, which is due and owing to Dr. Giurca.

73. Such conduct by Defendants has damaged Relator and continues to damage Plaintiff.  Accordingly, Plaintiff seeks injunctive relief of abiding by their agreement not to disparage him and to return all of his personal property including his research data, and pay him his accrued paid time off.

## FIFTH CLAIM

### Defamation

74. Dr. Giurca incorporates by reference the paragraphs above as if fully set forth herein.

75. Defendants defamed Dr. Giurca both by slander and libel.

76. A person is liable for defamation when: (a) the defendant makes a false statement that identifies the plaintiff; (b) the statement is publicized; and (c) damages exist. A defamatory statement exists when it is one that would adversely affect the reputation of a person. That statement is considered publicized so long as the defendant tells the statement to one other person, either negligently or deliberately. When the defamatory statement is verbal, damages are presumed when the statement deals with business or profession. When the defamatory statement is written and relates to a business or profession, damages are presumed.

77. If the statement is regarding a private figure but that of a public concern, the plaintiff must prove that the statement was made "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

## SIXTH CLAIM

### Interference with Business Relationships

78. Dr. Giurca incorporates by reference the paragraphs above as if fully set forth herein.

79. Defendant's intentionally interfered with Plaintiff's business relationships thus causing third parties to cease relations with Plaintiff. Plaintiff had obtained a successful bid at a major hospital facility, but Defendants sabotaged that business relationship by defaming Dr. Giurca.

## SEVENTH CLAIM

### Conversion

80. Dr. Giurca incorporates by reference the paragraphs above as if fully set forth herein.

81. Defendants have converted Dr. Giurca's property for their own use and have refused to return his property. Defendants are holding Dr. Giurca's property and attempting to use it for their own purposes and profit from Dr. Giurca's research data, which solely and exclusively belongs to Dr. Giurca. Dr. Giurca has requested the return of his property and Defendants have refused to allow Dr. Giurca access and retrieval of his valuable research data. This data was created, analyzed and used by Dr. Giruca to publish articles in his name. This data remains valuable to Dr. Giurca to further his research and continue to publish his medical research findings.

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

(a) On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor § 741, for double his back salary in an amount to be determined at trial, and restitution and payment of all benefits with interest.

(b) On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor Law § 741, an award of costs and attorney's fees; and

(c) On Fourth Claim awarding the Plaintiff injunctive relief, including the production of verification of his academic and clinical training, including litigation costs, and reasonable attorney's fees;

(d) On all other claims an amount to be determined at trial, including litigation costs and reasonable attorney's fees; and

(e) Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York,
       February 5, 2019

|  |  | **SADOWSKI KATZ LLP** |
|---|---|---|
|  |  |  |
|  | By: | s/ Robert W. Sadowski |
|  |  | Robert W. Sadowski<br>800 Third Avenue, 28th Floor<br>New York, New York 10022<br>Telephone: (646) 503-5341<br>rsadowski@sadowskikatz.com |